# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:24-cv-00226-RJC-SCR

ESTEBAN ARAUJO GUZMAN,      )
                                    )
      Petitioner,             )
                                      )
      v.                    )              **ORDER**
                                      )
BEGE ANDREINA KATTA BRAZON,  )
                                      )
      Respondent.          )
                                      )

       **THIS MATTER** comes before the Court on Petitioner Esteban Araujo Guzman's Verified Complaint and Petition for Return of the Child against Respondent Bege Andreina Katta Brazon pursuant to the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA") which was filed February 26, 2024. (Doc. No. 1; Petition). Petitioner seeks the return of his child to Peru, alleging that Respondent wrongfully retained the child in the United States since August 2023. On April 8, 2024, this Court held a bench trial on the issues raised.

       For the reasons explained below, the Court finds that Respondent is wrongfully retaining the child in the United States and has failed to establish by clear and convincing evidence an affirmative defense proving a grave risk of harm to the child if returned. Accordingly, the Court **GRANTS** Mr. Guzman's Petition.

1

# I. PROCEDURAL HISTORY

Subsequent to the filing of the Petition referred to above, on March 7, 2024, the Court entered a temporary restraining order prohibiting Respondent from removing the child from the Western District of North Carolina pending an expedited preliminary injunction hearing. (Doc. No. 5). The Court denied Petitioner's requests that the trial of the action on the merits be advanced and consolidated with the preliminary injunction hearing and that a warrant be issued requiring the United States Marshall to take physical custody of the child. (*Id.*).

On March 22, 2024, the Court held a preliminary injunction hearing. With the parties' consent, the Court extended the temporary restraining order pending a trial on the merits on April 8, 2024. At the Court's direction, on April 1, 2024, the parties submitted joint stipulations, trial briefs, and witness and exhibit lists. (Doc. Nos. 10–16). Among other things, the parties stipulated that Petitioner established a prima facie case for return of the child under the Hague Convention and that the parties disputed only whether a defense to ordering the child's return applies. (Doc. No. 10 at 3).

On April 8, 2024, this Court held a bench trial on whether the Hague Convention's "grave risk" exception applies. On April 9, 2024, the Court, for good cause shown, extended the temporary restraining order pending this Order's issuance. At the Court's direction, on April 12, 2024, the parties filed written closing arguments. (Doc. Nos. 18–19).

# II. FINDINGS OF FACT

During the one-day bench trial, the Court heard fact testimony from Petitioner, Respondent, Respondent's brother, and Respondent's sister-in-law. The Court notes that some of the testimony and evidence involves facts on which the parties agree or disputed facts that turn out not to be crucial to the decision, thus not requiring a determination. Other facts, however, are the subject of sharp disagreement, including those facts necessary to resolve the dispute. As to those facts, the Court makes certain findings specially. Fed. R. Civ. P. 52(a).

In making its findings, the Court has reviewed the record in its entirety, and it has had the opportunity to observe the witnesses, assess their credibility, and weigh their testimony. Here, Petitioner and Respondent have provided conflicting accounts of their relationship with each other and of Petitioner's relationship with the minor child. As a general matter, given the minimal corroborating evidence presented, the Court finds neither party's testimony appreciably more or less credible than the other's. The Court notes, however, that deficiencies in Respondent's testimony undermine the claimed severity of risk of harm to the minor child if returned to Peru.

A. Background

Petitioner Esteban Araujo Guzman and Respondent Bege Andreina Katta Brazon are the parents of minor child, M.K.A.[1] (Doc. No. 1-2). Petitioner is a citizen and resident of Peru. Respondent was born in Venezuela and currently resides at her brother's residence in Indian Trial, North Carolina. Respondent's residency in

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a)(3), the Court uses the minor child's initials to protect her privacy.

Peru, which must be reapplied for every two years, expired on December 29, 2023. Respondent and M.K.A. were granted Temporary Protective Status from the United States until April 2, 2025.

In the summer of 2018, Respondent fled from Venezuela to Peru to avoid political persecution and threats of harm. Petitioner and Respondent met in 2018 when Respondent began working at an optical shop owned by Petitioner. Respondent began working at Petitioner's optical shop while waiting to receive the proper documentation to work as a dentist in Peru. Respondent worked for Petitioner for a few months before transitioning to working for an endodontist, where she worked for approximately two years.

Petitioner and Respondent developed a dating relationship and moved in together in December 2019. Petitioner's 78 year-old mother also lived with the parties. On June 2, 2021, Respondent gave birth to M.K.A. in Lima, Peru. Since M.K.A.'s birth and until traveling to the United States, the parties and M.K.A. lived together as a family unit at Petitioner's home in Lima.

On July 13, 2023, Petitioner and Respondent traveled with M.K.A. to Indian Trial, North Carolina to celebrate Respondent's nephew's birthday. Petitioner and Respondent had tickets purchased to return with M.K.A. to Peru on August 1, 2023. Shortly before their scheduled return, Respondent informed Petitioner that she and M.K.A. would not be returning to Peru. Despite Petitioner's pleas, Respondent refused to allow Petitioner to take M.K.A. back to Peru with him. Petitioner has since returned to Peru and has been allowed limited video contact with M.K.A.

4

About one month later, on September 7, 2023, Petitioner submitted his Request for Return of the Child to the United States Department of State through the Peruvian Central Authority. (Doc. No. 1-4). The parties now dispute which jurisdiction is most appropriate to determine their custody rights. Before trial, the parties stipulated to the Convention's applicability and that Petitioner has established a prima facie case for return of the minor child. (Doc. No. 10 at 1–3).

### B. M.K.A.'s Life in Peru

Until traveling to the United States in July 2023, M.K.A. lived at Petitioner's home in Lima, Peru with Petitioner, Respondent, and Petitioner's mother. M.K.A. attended a nursery school selected by Respondent within walking distance of Petitioner's home. M.K.A. would attend the program for half days. During the bench trial, Petitioner submitted photographs of his home, including of M.K.A.'s playroom, demonstrating the parties' comfortable lifestyle. (Doc. No. 17, Pl. Ex. 3).

#### 1. Respondent's Testimony

Respondent testified that she was M.K.A.'s primary caregiver. (Trial Tr. at 63:12–15). She explained that Petitioner was "always busy with his work," "always on social media," and "always gave priority to his music and his sports." (*Id.* at 74:25–75:2). Respondent claimed that she would always ask Petitioner to stay home more so that he could participate more with their child, but Petitioner "always gave priority to his hobbies." (*Id.* at 75:1–5). Respondent testified that M.K.A. could be sick and she would ask Petitioner to "please stay," but Petitioner would nevertheless leave. (*Id.* at 75:13–14).

In her written testimony, Respondent claims that she directed nearly all aspects of M.K.A.'s upbringing, including M.K.A.'s physical and emotional well-being, health, food, and hygiene. (Doc. No. 8 at 3). Respondent alleges that since M.K.A.'s birth, Petitioner has shown very little love or affection to M.K.A. – fulfilling only an economic role. (*Id.* at 4).

Specifically, Respondent contends that Petitioner's only concerns about their daughter "seemed to be how much she weighed and how much she cost him." (*Id.* at 5). For example, Respondent alleges that Petitioner tried to limit M.K.A.'s consumption of certain products whenever possible and minimized her every symptom or discomfort to limit medical expenses. (*Id.* at 5–6). According to Respondent, Petitioner refused to help M.K.A. brush her teeth and would allow M.K.A. to spend "a long time in a dirty diaper" when in his care. (*Id.*).

Respondent claims that she would have to beg Petitioner to allow their child to go to the doctor or to receive emergency care. (*Id.* at 10). Respondent testified that after receiving care for a severe cold and nosebleed, M.K.A. was referred to a specialist. (Tr. at 85:12–25). Respondent alleges that the parties' insurance did not cover the specialist and that Petitioner did not want to pay the extra money for private insurance, the specialist, or medicine. (*Id.* at 85:25–86:16). As a result, Respondent claims that M.K.A. developed bronchitis. (*Id.* at 86:11–12).

Respondent further testified that despite living with the parties, Petitioner's mother never took care of M.K.A. (*Id.* at 84:18–19). Respondent complained that Petitioner's mother only tended to M.K.A. or picked her up and carried her when

6

Case 3:24-cv-00226-RJC-SCR   Document 20   Filed 04/26/24   Page 6 of 28

there "was some relative nearby so she could show off that she loved the baby." (*Id.* at 84:19–21). Respondent explained that Petitioner's mother always made a commotion to wake M.K.A. and that on a few occasions, she fed M.K.A. food that caused her to have diarrhea. (*Id.* at 84:21–85:9) Because Petitioner's mother is almost eighty years old, Respondent claims that she does not have the capacity to care for the parties' child. (*Id.*).

### 2. Petitioner's Testimony

Petitioner disagreed that Respondent was M.K.A.'s primary caregiver. (*Id.* at 53:8–11). During the bench trial, Petitioner testified that he was always very attentive to M.K.A's needs and would participate in feeding M.K.A. and change her diaper if needed. (*Id.* at 20:8–21:8). Petitioner testified that because he owns his own business, he is able to handle his own work schedule. (*Id.* at 52:24–53:2). Petitioner explained that he would typically get up in the morning with his daughter, help take her to and from nursery school, and then sometimes stay home with her for the rest of the day. (*Id.* at 20:8–14). When asked how often that occurred, Petitioner answered "four times a week." (*Id.* at 50:5). Petitioner further testified that the family was always together in the evenings and that his mother was also always at the home to oversee M.K.A. (*Id.* at 20:15, 53:10–11).

With respect to M.K.A.'s health, Petitioner testified that M.K.A. had both private and social insurance. (*Id.* at 50:20–21). Petitioner clarified that Respondent did not like the parties' insurance because she wanted to go to Venezuelan doctors that were very expensive. (*Id.* at 51:4–6). Petitioner reiterated that his daughter

7

had "two types of insurance." (*Id.* at 50:20–21).

Petitioner further testified that his mother has lived with him for eight years and still lives with him today. (*Id.* at 23:9–16). Petitioner explained that his mother is "enchanted by [his] daughter" and adores her. (*Id.* at 23:13). According to Petitioner, his mother would try to help out with M.K.A. whenever she could and would step in when the parties were busy. (*Id.* at 23:17–22). Petitioner described his mother's relationship with Respondent as a "good relationship" during the first years but clarified that later on, Respondent did not get along well with his mother; Petitioner claims that Respondent did not treat his mother well. (*Id.* at 24:4–15).

### 3. Credibility Determinations

The Court finds neither party's testimony regarding M.K.A.'s life in Peru appreciably more or less credible than the other's. The Court notes that Respondent's testimony was corroborated to a limited extent. Respondent's brother, having met Petitioner for the first time (and briefly) in July 2023, testified that Petitioner seemed "disinterested for the most part." (*Id.* at 98:7–8). He observed, among other things, that Respondent would have to ask him to help her with feeding their child. (*Id.* at 98:8–15). Respondent's sister-in-law, also having met Petitioner for the first time in July 2023, testified that Petitioner "never bothered changing a diaper or feeding [the child]." (*Id.* at 106:1–2). She testified that "it was always [Respondent] who had to take care of every need." (*Id.* at 106:2–3).

### C. Allegations of Physical and Verbal Abuse

#### 1. Respondent's Testimony

Respondent testified that she noticed a change in her relationship with Petitioner following M.K.A.'s birth. (*Id.* at 72:18–25). Respondent explained that before their daughter's birth, Petitioner had "an obsession about a person's weight." (*Id.* at 72:21–22). Respondent assumed it was some ideation that Petitioner had because of sports. (*Id.* at 72:23–24). Respondent testified that she lost 16 kilos (approximately 35 pounds) since meeting Petitioner and that he expected her to "lose even more weight." (*Id.* at 73:1–2). Respondent testified that Petitioner was also very controlling about her phone usage. (*Id.* at 73:3–6). She assumed it was his worry about safety "because for women it's very worrisome in Peru." (*Id.*).

When their daughter was born, however, Respondent testified that Petitioner's ideations became "much stronger and more obsessive." (*Id.* at 73:7–8). She explained that as she gained weight due to her pregnancy, Petitioner criticized her. (*Id.* at 73:8–10). Respondent testified that Petitioner's verbal attacks became so intense that they started to "affect [her] mind." (*Id.* at 73:10–13). According to Respondent, Petitioner began minimizing her and yelled at her if she didn't have his food or clothes ready. (*Id.* at 73:14–18). Respondent testified that Petitioner complained that all she did was "take care of the baby." (*Id.*).

Respondent testified that Petitioner's actions became physical after 2022. (*Id.* at 73:19–23). Respondent explained that Petitioner started pulling her hair at "[w]hatever motivated him." (*Id.* at 73:23–25). According to Respondent, the parties would be talking or arguing, and Petitioner would come around from behind her, grab her hair, and pull her back. (*Id.* at 74:1–8). Respondent testified that

9

Petitioner assumed that she was being unfaithful to him and that every time he pulled her hair, he would say "watch yourself and don't be unfaithful because you don't know what I'm capable of doing." (*Id.*). When asked whether the hair pulling was frequent, Respondent testified that it was "difficult to describe because it was spontaneous." (*Id.* at 78:16). Respondent later testified that at some point, while grabbing her hair, Petitioner began forcing Respondent to watch a video of a man killing his former partner with a knife after finding her having sexual relations with another man. (*Id.* at 80:2–8, 81:9–20). Respondent testified that as a result of being shown the video, she feared for her life. (*Id.*).

Respondent testified that after 2023, Petitioner's physical aggression grew more intense. (*Id.* at 75:17–18). According to Respondent, the hair pulling became slaps to the face and forcible sex. (*Id.* at 75:18–19). Respondent testified that M.K.A. slept in the same bedroom as the parties and was always present for the physical aggressions. (*Id.* at 75:24–25, 76:13–22). Respondent described M.K.A. as a silent victim of "every shout, every fight, every pulling of hair." (*Id.* at 76:3–6). Respondent testified that as a small child, M.K.A. didn't understand what was going on but that she would cry and could feel that something bad was happening. (*Id.* at 76:4–8).

In response to M.K.A.'s cries, Respondent testified that Petitioner would yell at her to be quiet and "raised his hand sometimes as if he was going to strike her." (*Id.* at 76:23–25). Respondent testified that because Petitioner was becoming more aggressive with no warning, "there was nothing to guarantee that he wasn't going

to do that to the child at any moment." (*Id.* at 76:10–12). During one February 2023 argument that arose out of Respondent catching Petitioner using the Tinder app, Respondent claims that Petitioner suggested that they "get rid of the baby" so they could "have a relationship again." (*Id.* at 77:4–13).

In her written testimony, Respondent alleges:

- On June 2, 2022, on [M.K.A.'s] first birthday, we argued about her birthday arrangements. I took a few steps away from Esteban and while using my phone he caught me off guard by my hair demanding to know who I was talking to. He then threatened me by telling me that if I were ever unfaithful to him, I would find out what he was capable of.

- On December 31, 2022, after we had argument due to a complaint from Esteban's mother, I went up to the room where my daughter was sleeping. Soon after Esteban came upstairs to see what I was doing. When he found me using my phone, he grabbed me again by the hair to see who I was talking to and repeated the same threat that I should never be unfaithful to him, or I would find out what he would be capable of. My daughter had woken up to the noise.

- On February 14, 2023, I was not in the mood, so I refused to have sex with Esteban. Once I refused, he slapped me and then turned over and pretended to sleep. The baby was asleep next to us.

- February 19, 2023, was the first time Esteban forced me to have sex. Earlier that day, I caught him being unfaithful using a phone app for Tinder. We had an argument, where he blamed me for his infidelity, asked me in a threatening way if I wanted to end the relationship, and, then, even hinted if I wanted to get rid of our daughter to become a couple again. I left him alone in the living room and when I went to the bedroom to put my daughter to bed, Esteban followed me. I continually asked him to leave me alone, but he only came closer to kiss me and control me despite my pleas to stop. He then forced me to have sex in the same bed where my daughter was sleeping. She woke up crying with all the noise. I told him I would report him, but he only responded that no one would believe me because we were a couple, reminding me that he had a family of policemen and lawyers.

11

- On April 18, 2023, Esteban took our daughter downstairs for breakfast and while I started to feed her, he insisted on making me watch a video on his phone. The video was of a woman who was killed by her partner with a knife when he found her being unfaithful with another man. When the video ended Esteban pulled my hair towards him and then threatened me again - telling me that I better not ever be unfaithful to him, or he would not know what he was capable of. The baby was present.

- On June 12, 2023, after the appointment with our daughter's otolaryngologist, Esteban and I argued in the car about the price of the consultation again. I started looking at my phone to end the argument and he grabbed me by the hair to find out who I was talking to and if I was being unfaithful, threatening me again that I would not know what he would be capable of if I cheated on him with another man. Later that evening, Esteban again forced me to watch the video of the woman being killed by her partner with a knife after he found her being unfaithful.

- On June 18, 2023, Esteban again forced me to have sex. We argued because it was Father's Day, and he was upset that I did not give him the sexual attention he thought he deserved on that day. I was very sick from a worsening flu virus, and I was emotionally unwell because of all the mistreatment I was receiving from him. While we were in the bed, he insisted on having sex. I tried multiple times to refuse, but he forced himself on me without caring. Again, my daughter was there and woke up crying.

- On July 2, 2023, after concluding a meeting with his friends at the house Esteban slapped me inside our room. He told me how upset he was because I had not bought some products for that meeting and felt that I made him look bad with his friends. My daughter was present in the room.

- On July 11, 2023, he forced me to have sex again. Due to my persistent illness and deep cough, I had severe rib pain and tenderness. He was well aware of this. Despite my constant refusals and attempts to get him off me, he took advantage of my pain by pressing his hand on my ribs to make me physically vulnerable and allow him to have sex with me. My daughter woke up due to all the noise.

- On July 20, 2023, while staying at my brother's house in Indian Trail,

> Esteban pushed me in our bedroom while we were in there with our daughter. He was upset that I was not giving him the attention he wanted in front of my family. Because of his push, I hit the corner of the bedframe very hard and suffered a bruise on my right leg.

(Doc. No. 8 at 6–9).

Respondent testified about the alleged July 20 incident that occurred at her brother's home in Indian Trail, North Carolina. Respondent testified that she was trying to get the baby to go to sleep when Petitioner came up and started arguing with her. (Tr. at 87:14–17). According to Respondent's trial testimony, Petitioner pushed her while carrying the child. (*Id.* at 87:17–20). She testified that Petitioner "didn't even care that [she] was carrying the baby." (*Id.*). Respondent explained that as a result of the shove, she hurt her leg. (*Id.*). Respondent testified that she took pictures of her leg "the day later." (*Id.* at 88:3–4). Respondent submitted the pictures that she had taken to the Court; the pictures were dated July 26, 2023 – six days after the alleged incident. (Doc. No. 17, Def. Ex. 3).

Following the alleged incident, Petitioner, Respondent, and M.K.A. continued to share a bedroom in Respondent's brother's home for approximately ten days. (Tr. at 62:8–63:3). Respondent did not seek a domestic violence restraining order against Petitioner in the United States, consult with the police, or otherwise seek criminal charges. (*Id.* at 62:15–63:8). Further, it does not appear that Respondent informed anyone, including her brother or sister-in-law, of the alleged incident until after Petitioner had left her brother's residence. Before Petitioner returned to Peru on the parties' scheduled flight, Respondent asked Petitioner to extend his stay in the United States to "talk further about [the parties'] situation." (*Id.* at 94:16–24).

Respondent now claims that she cannot go back to Peru for "safety reasons." (*Id.* at 59:18–19). When asked about the reasons she fears for her safety, Respondent testified, "[i]t's mainly because of [Petitioner]." (*Id.* at 60:1). Respondent claims that her "life is in danger" near Petitioner. (*Id.* at 59:21–23). When asked about her concerns about M.K.A. if she is returned to Peru, however, Respondent replied, "I would like the custody case to be heard here." (*Id.* at 92:15–17).

Despite Respondent's allegations of abuse against her, Respondent acknowledged that Petitioner "hadn't put a hand on [M.K.A.] directly." (*Id.* at 89:22–24). The Court notes that Respondent has never sought a restraining order against Petitioner in Peru or in the United States. Respondent has never gone to the police about incidents of domestic violence in Peru or in the United States. Respondent did not attempt to leave the parties' home in Peru at any time before coming to the United States. And Respondent does not appear to have informed any of her family members about the alleged abuse until after she had retained M.K.A. in the United States. Respondent testified that at the time she arrived in the United States, she did not intend to stay indefinitely. (*Id.* at 65:9–15).

Respondent claims only that "when the attacks got more aggressive and more intense," she informed Petitioner's mother of the abuse. (*Id.* at 83:21–22). But Respondent testified that Petitioner's mother did not help and responded, "that's what Venezuelan women deserve for being prostitutes." (*Id.* at 83:24–25). Respondent explained that she did not seek help because "to file some kind of an order or accusation against somebody in Peru is essentially a sentence against

14

women, because authorities do not listen to things like that for women." (*Id.* at 61:7–10). Respondent testified that in Peru, "the authorities never help women." (*Id.* at 63:21–23). Respondent claimed, "There could be various calls to the police. There could be a record of five, six times they called the police, and nothing happens. Nothing is done until the woman turns up dead." (*Id.* at 81:23–82:3). And Respondent indicated that Petitioner was "always happy to tell [her] that he had relatives in the police force." (*Id.* at 82:4–5).

### 2. Petitioner's Testimony

Petitioner tells another story. Upon receiving Respondent's written testimony, Petitioner testified that that "it was lies, just lies, and it just broke my heart." (*Id.* at 39:13–14). Petitioner testified that Respondent's allegations, as they relate to abuse, are all untrue. (*Id.* at 40:13–15). Petitioner denied ever pulling Respondent's hair during the parties' relationship. (*Id.* at 39:18–20). He denied slapping Respondent. (*Id.* at 39:15–17). He denied all allegations of sexual abuse. (*Id.* at 39:24–25). And he denied pushing Respondent and leaving bruises on her leg when visiting Respondent's family in Indian Trail, North Carolina. (*Id.* at 40:1–6). Petitioner admitted that Respondent had found him using Tinder. (*Id.* at 39:21–23).

Petitioner testified that he and Respondent did not experience relationship issues besides sometimes "because of money." (*Id.* at 13:11–13). According to Petitioner, Respondent never spoke about breaking up with Petitioner or about leaving Peru or Lima. (*Id.* at 13:14–16, 25:18–25). Further, during the bench trial, Petitioner submitted several photographs of the parties and M.K.A. taken during

the timeframe in which Respondent alleges that she feared for her life as a result of Petitioner's abuse. (Doc. No. 17, Pl. Ex. 2).

For example, Petitioner presented a photograph of the parties, M.K.A, and M.K.A's godparents at M.K.A.'s christening in Peru; a photograph from the christening celebration and M.K.A.'s second birthday; a photograph of the parties, M.K.A., and her godparents at a dinner for Respondent's birthday; a photograph of M.K.A. at a Father's Day celebration at her nursery school; a photograph of Petitioner and M.K.A. in the bed that Petitioner, Respondent, and M.K.A. would share; a photograph from a trip that Petitioner, Respondent, and M.K.A. took to visit Respondent's family; and a photograph of the parties and M.K.A. on the plane before arriving in the United States. (*Id.*).

Petitioner described the parties' July 2023 visit to Respondent's brother's home as a "very friendly visit." (Tr. at 30:18–24). Petitioner testified that the parties visited with family members and celebrated the birthday of Respondent's nephew. (*Id.*). Petitioner denied arguing with Respondent while visiting Respondent's family in the United States and denied seeing any bruising on Respondent during the parties' trip. (*Id.* at 30:25–31:1, 40:7–9).

Petitioner claims that one day before the parties' scheduled departure, Respondent informed him that she and M.K.A. would not be returning to Peru because their relationship "was not going well" and he was "stingy." (*Id.* at 31:2–32:4). Petitioner tried to convince Respondent to return, but she refused. (*Id.* at 32:5–13). Petitioner nevertheless returned to Peru given his work responsibilities

and belief at the time that it was just "going to be a matter of a few days that [Respondent] was angry about something and that then she would come back." (*Id.* at 31:20–32:1).

Petitioner testified that the first time that he heard from Respondent about any of the alleged abuse was in September 2023 after Petitioner refused to sign documents that would ensure that Respondent could keep M.K.A. in the United States. (*Id.* at 35:22–36:5). According to Petitioner, after he refused to sign the documents, Respondent became angry. (*Id.* at 41:14–18). Shortly thereafter, Respondent asked Petitioner to send money to her brother's account. (*Id.*). Petitioner testified that he bought and sent several items from Walmart to Respondent and M.K.A. in the United States and sent $600 to Respondent's brother's account. (*Id.* at 41:20–24, 42:5–6). Nevertheless, Petitioner testified that because Respondent and her family were accusing him of things that he did not do, he did not feel comfortable visiting his child without legal advice. (*Id.* at 44:3–6).

When asked whether he has any family in the police force, Petitioner mentioned one distant female cousin. (*Id.* at 49:17–23). Petitioner further characterized Respondent's claim that his mother said that all Venezuelan women are prostitutes as a lie. (*Id.* at 52:15–19). Petitioner testified that he never heard his mother make such a statement. (*Id.*).

Petitioner testified that he does not have a criminal record, has never been arrested, has never been charged with a crime, has never received any traffic citations, has never been involved with the court system, has never filed a lawsuit,

and has never had a lawsuit filed against him. Petitioner further testified that he has never been contacted by the Department of Social Services in Lima, Peru – the Ministry of Women, Children, and Adolescents. (*Id.* at 36:20–39:7).

### 3. Credibility Determinations

The Court does not take lightly the distress that Respondent alleges Petitioner caused and is sensitive to the reasons Respondent cites for not reporting the alleged abuse. But the Court finds that deficiencies in Respondent's testimony undermine her credibility with respect to the claimed severity of risk of harm to M.K.A. if she is returned to Peru.

Respondent offered no corroboration of her abuse allegations in the form of contemporaneous complaints to third parties, substantiated charges, intervention by law enforcement, or contemporaneous medical reports. Respondent submitted only two photographs depicting bruising that she claims she sustained as a result of an alleged July 20 incident in which Petitioner shoved Respondent into a bed frame at her brother's home.

The credibility of Respondent's allegation, however, is undermined by inconsistencies in her own testimony. In her written testimony, Respondent alleged only that Petitioner "pushed [her] in [the parties'] bedroom while [they] were in there with [their] daughter." (Doc. No. 8 at 9). But during the bench trial, Respondent testified that Petitioner pushed her while holding their daughter, explaining that Petitioner "didn't even care that [she] was carrying the baby." (*Id.* at 87:17–19). Further, Respondent testified that she took pictures of her leg "the

day later." (*Id.* at 88:3–4). The photographs submitted to the Court are dated July 26, 2023 – six days after the alleged incident.

Respondent's fact witnesses similarly could not corroborate her allegations of abuse. Respondent's brother testified that Petitioner "seemed somewhat authoritative" because he "talked about work and how the woman should stay at home, things of that nature." (*Id.* at 97:25–98:4). But Respondent's brother testified that he had never observed Petitioner physically hit or otherwise abuse Respondent or M.K.A. (*Id.* at 98:5–8). Respondent's brother explained that Respondent had never approached him about Petitioner's domestic abuse. In fact, Respondent's brother testified that he became aware of the alleged abuse only after the family "hired the attorney services." (*Id.* at 100:6–7).

Respondent's sister-in-law testified that she "always" spoke to Respondent, estimating that her and Respondent spoke two or three times per week. (*Id.* at 102:6–10). But Respondent's sister-in-law indicated that before Respondent's visit to the United States, Respondent had never informed her of any of the alleged abuse and that "it's just now that we're finding out of the many other things." (*Id.* at 102:11–14, 103:22–24).

Regarding the alleged July 20 incident, Respondent's sister-in-law testified only that she had heard the parties arguing the same day and a "thump." (*Id.* at 103:9–12). Respondent's sister-in-law explained that she did not "hear anything beyond that." (*Id.*). She testified that when she asked Respondent what had happened the next day, Respondent indicated that the parties had argued. (*Id.* at 103:12–18).

Respondent's sister-in-law encouraged Respondent to talk to her brother, but Respondent declined. (*Id.*). Respondent's sister-in-law testified that she observed a bruise on Respondent's leg two days after the alleged incident. (*Id.* at 104:2–7). She testified that when she asked Respondent about the bruise, Respondent started to cry. (*Id.*).

Respondent's claim that she fears for life when she is near Petitioner is undermined by her own testimony that, during the alleged timeframe of abuse, she frequently asked Petitioner to become more involved in their child's life. Respondent testified that she "always asked [Petitioner] to stay home more so he could participate more in the child." (*Id.* at 75:3–4, 94:12–15). Further, the Court finds Respondent's claim that she cannot return to Peru for safety reasons inconsistent with her testimony that following the alleged July 20 incident at her brother's home, she and M.K.A. continued to share a room with Petitioner for approximately 10 days, and she nevertheless asked Petitioner to extend his stay in the United States. (*Id.* at 62:8–63:3, 94:16–24).

Respondent's claim that M.K.A. faces a grave risk of harm from Petitioner if returned to Peru is similarly undermined by her own testimony that Petitioner "hadn't put a hand on [M.K.A.] directly" and that "as a small child [M.K.A.] doesn't understand what's going on." (*Id.* at 89:22–23:1, 76:6–8). And when asked directly about her concern with M.K.A. being sent back to Peru, Respondent first replied, "I would like the custody case to be heard here." (*Id.* at 92:15–16).

Finally, the Court notes that while Respondent's fact witnesses corroborated her

testimony only to a limited extent, their testimony calls into question the credibility of some of Petitioner's sweeping denials, including that the parties did not experience relationship issues and did not fight during their visit to Indian Trail, North Carolina.

## III. CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331. Venue is proper pursuant to 22 U.S.C. § 9003(b) and 28 U.S.C. § 1391(b). The Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), as implemented through the International Child Abduction Remedies Act ("ICARA"), was created "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Palomo v. Howard*, 426 F. Supp. 3d 160, 167 (M.D.N.C. 2019) (quoting International Child Abduction Convention, 1980 U.S.T. LEXIS 100, 1988 WL 411501 ("Hague Convention")).

The Hague Convention's primary purpose is "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993)). "The Convention's core premise is that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan v. Saada*, 142 S. Ct. 1880, 1888 (2022) (internal quotations

omitted). Thus, a court considering a Hague Convention petition has jurisdiction over only the wrongful removal or retention claim. *See* Hague Convention, art. 16.

### A. Prima Facie Case of Wrongful Retention

To secure the return of an abducted child, a petitioner must prove that the child "has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1). To prevail on his wrongful retention claim, Petitioner must prove by a preponderance of the evidence that: (1) M.K.A. was "habitually resident" in Peru at the time of her retention in the United States; (2) that the retention was in breach of Petitioner's custody rights under Peruvian law; and (3) that Petitioner had been exercising those rights at the time of M.K.A.'s retention. *See Miller*, 240 F.3d at 398.

Here, the parties stipulated that Petitioner has established a prima facie case of wrongful retention under the Convention. (Doc. No. 10 at 3, ¶ 19). M.K.A. has been retained in the United States without Petitioner's consent since August 1, 2023. (*Id.* at 3, ¶¶ 15–16). The parties agree that "Peru is the country of habitual residence for the minor child, M.K.A., in that the minor child was born in Peru, lived in Peru all of her life, and attended nursery school in Peru," (*id.* at 2, ¶ 8), and "that the parties were exercising their rights of custody pursuant to Peruvian law prior to the minor child coming to the United States in July 2023." (*Id.* at 2, ¶ 12). The Court likewise finds these elements satisfied.

Having found that Petitioner has established his prima facie case of wrongful retention under the Convention, M.K.A. must be promptly returned to Peru unless

22

Respondent can establish the applicability of one of the Convention's narrow exceptions; mandatory return of the child then becomes discretionary. 42 U.S.C § 11601(a)(4).

## B. Grave Risk Exception

Respondent argues that the Court should decline to order M.K.A.'s return to Peru because the Convention's "grave risk" exception applies. Article 13(b) of the Convention provides that courts are not bound to return a child to their habitual state of residence if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).

Respondent bears the burden of establishing the defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). "The choice to impose that high burden of proof was designed to make a difference, and should make a difference, in cases exactly like this one where it is difficult to make a reliable factual determination." *Khan v. Fatima*, 680 F.3d 781, 792 (7th Cir. 2012). But "even without independent corroboration, a factfinder's belief in a single witness's testimony alone can be sufficient to satisfy a party's burden to prove a fact by clear and convincing evidence." *Silva v. Dos Santos*, 68 F.4th 1247, 1255 (11th Cir. 2023).

"The 'grave risk' exception is narrow and may not be used as a substitute for litigating the child's best interests." *Carmona v. Moreno*, 2024 U.S. Dist. LEXIS 25815, at *12–13 (M.D.N.C. Feb. 13, 2024) (citing *Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 595 (D.S.C. 2013)). "Only evidence directly establishing the existence of a

grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." *Id.* at 13 (quoting Pub. Not. 957, 51 Fed. Reg. at 10510). "[T]he grave risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." *See Salguero v. Argueta*, 256 F. Supp. 3d 630, 636 (E.D.N.C. 2017) (quotations omitted); *see also Alcala v. Hernandez*, 2015 U.S. Dist. LEXIS 93719, at *15 (D.S.C. July 20, 2015), *aff'd*, 826 F.3d 161 (4th Cir. 2016).

Courts have held that the grave risk defense applies in two situations: (1) "when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease," and (2) "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996).

"Significant physical and verbal abuse of a spouse and child can . . . establish a grave risk." *Ischiu v. Garcia*, 274 F. Supp. 3d 339, 350–51 (D. Md. 2017) (citing *Simcox v. Simcox*, 511 F.3d 594, 599, 609 (6th Cir. 2007) (finding grave risk arising from the father's verbal and physical abuse of the mother in the children's presence, as well as "frequent episodes of belt-whipping, spanking, hitting, yelling and screaming, and [pulling of] hair and ears" against the children); *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (finding evidence of grave risk sufficient to deny summary judgment where the father frequently and

24

seriously beat, kicked, and choked the mother, verbally abused her, struck the child on several occasions, and threatened to kill the mother and the children)).

"Courts have [also] found grave risk based on domestic abuse of the spouse in the presence of the children, even without abuse directed at the children themselves." *Ischiu*, 274 F. Supp. at 351 (citing *Walsh v. Walsh*, 221 F.3d 204, 210–11, 219–20 (1st Cir. 2000) (finding a grave risk of harm to the children where the father physically abused the mother for several years, often in front of the children, and had a history of fights with and threats against persons other than his wife and violating court orders); *Baran v. Beaty*, 526 F.3d 1340, 1345–46 (11th Cir. 2008) (finding grave risk of harm to the child where the father abused alcohol daily and often drove drunk, was physically and verbally abusive toward the mother in the child's presence, including by throwing furniture and other objects at her, and recklessly and negligently endangered the child when they lived with him)).

The Court finds that Respondent has not met her burden to prove by clear and convincing evidence a grave risk of harm to M.K.A. if returned to Peru. Respondent has failed to present any credible evidence of past or present harm directly to M.K.A. at the hands of Petitioner. Further, Respondent has failed to demonstrate how Petitioner's alleged abuse of Respondent creates a grave risk of physical or psychological harm to M.K.A. or otherwise places M.K.A. in an intolerable situation if returned to Peru.

1. *Risk of Harm Directly to M.K.A.*

Respondent has presented little to no evidence demonstrating that M.K.A. would

be exposed to direct abuse or other harm at the hands of Petitioner if returned to Peru. The record is devoid of allegations that Petitioner has actually abused M.K.A., threatened to abuse M.K.A., or inspired fear of abuse in M.K.A. Respondent claims only that in response to M.K.A.'s cries, Petitioner would yell at her to be quiet and "raised his hand sometimes as if he was going to strike her." (Tr. at 76:23–25). But to the contrary, Respondent's testimony demonstrates that Petitioner never "put a hand on [M.K.A.] directly" and that "as a small child [M.K.A.] doesn't understand what's going on." (*Id.* at 89:22–90:1, 76:6–8).

2. *Risk of Harm from Exposure to Abuse of Respondent*

The Court finds Respondent's argument that Petitioner's physical and verbal abuse towards her presents a grave risk of harm to M.K.A. if returned to Peru similarly unsuccessful. Regardless of the weight afforded Respondent's allegations, Respondent has failed to present sufficient evidence of how the alleged abuse has affected or is likely to affect M.K.A. The Court observes that M.K.A. shared a bedroom with the parties during the timeframe in which Respondent alleges that she feared for her life as a result of Petitioner's physical and verbal abuse. Even so, Respondent has presented no evidence of the physical or psychological impact of Petitioner's abuse on M.K.A. Respondent testified only that M.K.A. would cry as a result of the alleged incidents.

Respondent fails to demonstrate how her allegations of abuse – even if credited – seriously endanger M.K.A. or otherwise result in a grave risk of future physical or psychological harm if she is returned to Peru. The absence of direct abuse to M.K.A.

and persons other than Respondent distinguishes this case from others in which courts have found grave risk based on a petitioner's wider propensity for violence or disregard for the law. Rather, here, the Court observes a sample of abuse allegations that appear to be limited to the context of Petitioner and Respondent's dating relationship. Respondent cites Petitioner's concerns about Respondent's fidelity as a consistent reason for the alleged abuse.

The Court finds that the lack of corroborating evidence of Petitioner's abuse, inconsistencies in Respondent's testimony, the timing in which Respondent's abuse allegations arose, Respondent's apparent motivation that the parties' custody rights be determined in the United States, and the fact that the parties have since ended their dating relationship undermine Respondent's claim that that M.K.A. will be subjected to a grave risk of physical or psychological harm or otherwise placed in an intolerable situation if returned to Peru. Thus, Respondent fails to demonstrate that M.K.A.'s return to Peru would present a "grave risk" of harm by clear and convincing evidence.

## IV.   CONCLUSION

**IT IS, THERFORE, ORDERED** that:

> (1) Petitioner's Verified Complaint and Petition for Return of the Child pursuant to the Hague Convention, (Doc. No. 1), is **GRANTED**;

> (2) On or before May 3, 2024, counsel for the parties shall confer and file a joint proposal detailing the manner and means by which

M.K.A. will be safely and expeditiously returned to Peru or informing the Court of their failure to reach an agreement;

(3) Petitioner shall have until May 8, 2024, to file any motion to recover necessary expenses incurred in this action pursuant to 22 U.S.C. § 9007(b)(3);

(4) The Clerk of Court is directed to enter judgment in accordance with this Order, but the case shall remain open pending further order directing how the child is to be returned.

Signed: April 25, 2024

Robert J. Conrad, Jr.
United States District Judge